# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NABIL SALAMA, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024-1124-JTL |
| IRWIN D. SIMON, JODI BUTTS, DAVID CLANACHAN, JOHN M. HERHALT, DAVID HOPKINSON, THOMAS LOONEY, RENAH PERSOFSKY, and TILRAY BRANDS, INC., | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION GRANTING SUMMARY JUDGMENT FOR DEFENDANTS

Date Submitted: November 22, 2024
Date Decided: November 27, 2024

F. Troupe Mickler IV, ASHBY & GEDDES, P.A., Wilmington, Delaware; William J. Fields, Christopher J. Kupka, Samir Shukurov, FIELDS KUPKA & SHUKUROV LLP, Pleasantville, New York; D. Seamus Kaskela, Adrienne Bell, KASKELA LAW LLC, Newtown Square, Pennsylvania; *Attorneys for Plaintiff.*

Ronald N. Brown, III, Daniel P. Klusman, DLA PIPER LLP (US), Wilmington, Delaware; Steven M. Rosato, DLA PIPER LLP (US), New York, New York; *Attorneys for Defendants.*

**LASTER, V.C.**

A Delaware corporation allegedly issued a proxy statement that misstated the voting standard for approving a charter amendment to increase its authorized shares of common stock. The proxy statement disclosed that the amendment would pass if more shares voted for it than against it, thereby applying a votes-cast standard.

The corporation's charter states in pertinent part: "The number of authorized shares of Common Stock . . . may be increased . . . by the affirmative vote of the holders of a majority of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon" (the "Single Vote Provision"). Citing that provision, the plaintiff contends that the amendment requires approval by a majority of the voting power carried by all of the outstanding shares, voting as a single class.

The defendants rely on Section 242(d) of the Delaware General Corporation Law (the "DGCL"). The Council of the Corporate Law Section of the Delaware State Bar Association (the "Council") proposed that section as an amendment in 2023, and it became law later that year. The defendants maintain that Section 242(d)(2)(B) imposes the vote-cast standard. They say that under Section 242(d)(2), the Single Vote Provision only functions to eliminate the need for a class vote under Section 242(d)(2)(C).

The plaintiff responds by pointing to another portion of Section 242(d). By its terms, that subsection applies unless the charter "otherwise expressly require[s]" a different vote. The plaintiff says that the Single Vote Provision does what Section 242(d) permits by opting out of the votes-cast standard.

The complaint frames the voting-standard issue as a disclosure violation and asserts claims for breach of fiduciary duty against the corporation's directors. The plaintiff seeks a preliminary injunction barring the corporation from proceeding with its meeting of stockholders unless the directors change the proxy statement to disclose that the amendment requires approval from a majority of the outstanding shares.

The defendants cross-moved for summary judgment. Because the plaintiff's injunction application rises or falls on the issue of law that the cross-motion presents, this decision analyzes the issue of law through the lens of the summary judgment motion.

Each side has advanced a reasonable reading of Section 242(d), creating ambiguity and requiring an examination of extrinsic evidence. This decision concludes that when a charter provision like the Single Vote Provision pre-dated the adoption of Section 242(d) and closely tracks the last sentence of Section 242(b)(2), its only effect is to eliminate the need for a class vote under Section 242(d)(2)(C).

The defendants' motion for summary judgment is granted. The plaintiff's motion for a preliminary injunction is denied.

## I. FACTUAL BACKGROUND

The facts are undisputed. They come from the parties' submissions.[1]

---

[1] Citations in the form "OB" refer to Defendants' Omnibus Brief in Opposition to Plaintiff's Motion for Preliminary Injunction and in Support of Defendants' Motion for Summary Judgment. Citations in the form "DRB" refer to the Defendants' Reply

## A.   The Company And Its Charter

Tilray Brands Inc. (the "Company") is a Delaware corporation headquartered in Leamington, Ontario, Canada. The Company describes itself as a global lifestyle consumer products company. Its products include medical and adult-use cannabis, craft beer, spirits, beverages, and hemp foods. Its common stock trades on Nasdaq under the symbol TLRY.

The Company was formed in 2018. Its initial certificate of incorporation contained a version of the Single Vote Provision. *See* OB Ex. B. The Company subsequently amended and restated its charter four times, with each iteration retaining a version of the provision. *See* OB Ex. C–F. The currently operative charter states:

> The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares of Common Stock, or Preferred Stock then outstanding) by the affirmative vote of the holders of a majority of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon, without a vote of the holders of the Preferred Stock, or of any series thereof, or Common Stock unless a vote of any such holders is required pursuant to the terms of any certificate of designation filed with respect to any series of Preferred stock (a "***Certificate of Designation***").

Charter, art. IV.B.

Brief in Support of Defendants' Motion for Summary Judgment. Citations in the form "PRB" refer to the Plaintiff's Reply Brief in Support of Plaintiff's Motion for Preliminary Injunction and in Opposition to Defendants' Motion for Summary Judgment. Citations to the "Charter" reference the Fourth Amended and Restated Certificate of Incorporation of Tilray, Inc.

3

**B.      The 2023 DGCL Amendments**

In 2023, the Council proposed amendments to the DGCL that included changes to Section 242 (the "2023 Amendments"). Through those changes, the Council sought to make it easier for corporations to increase their authorized shares.

To achieve that goal, the 2023 Amendments lowered the vote required for a charter amendment that increased the authorized shares. Before the 2023 Amendments, that type of charter amendment had to receive two approvals. First, the amendment had to receive approval from a majority of the corporation's outstanding shares. Second, the amendment had to receive approval from a majority of the outstanding shares of the class of stock that the amendment increased.

For both votes, the denominator was the outstanding shares (the "Majority-of-the-Outstanding Standard"). But there are two other commonly used denominators for voting. One is the shares present in person or by proxy and entitled to vote at a meeting where a quorum is present (the "Majority-of-the-Quorum Standard"). Another is the votes cast, often framed as a requirement that the votes in favor exceed the votes against (the "Majority-of-the-Votes-Cast Standard").

These standards have different implications. Under the Majority-of-the-Outstanding Standard, a proposal must receive approval from 51% of the shares entitled to vote. Broker non-votes, abstentions, and shares not present at the meeting all operate as votes against the proposal. Stockholders who oppose a proposal need not vote; they can simply do nothing.

4

Under the Majority-of-the-Quorum Standard, a proposal must receive approval from 51% of the shares present in person or by proxy and entitled to vote. Abstentions are equivalent to no votes because they do not contribute to the majority. Shares not present at the meeting have no effect. A stockholder who opposes a proposal must return a proxy or appear at the meeting. Once there, the stockholder can oppose the proposal by voting against, abstaining, or not voting.

Under the Majority-of-the-Votes-Cast Standard, a proposal need only receive a majority of the votes cast. Absent shares do not cast votes. Abstentions and broker non-votes do not count as votes cast. A stockholder who opposes a proposal must return a proxy or appear at the meeting and vote against.

Because of how the Majority-of-the-Votes-Cast Standard works, a measure can pass with less than a majority of the quorum, and far less than a majority of the outstanding. Assume (unrealistically) that enough shares were present in person or by proxy to establish a quorum, but that only three shares voted. The vote of two shares could constitute approval.

The 2023 Amendments lowered the required vote for an amendment to increase the authorized shares from the Majority-of-the-Outstanding Standard to a Majority-of-the-Votes-Cast Standard. That was a significant change.[2] By default, a

---

[2] At least one scholar has questioned the policy justification for lowering the voting standard. *See* Usha Rodriguez, *The Hidden Logic of Shareholder Democracy* at 45–49, 60–63 (Mar. 24, 2024), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4755251.

quorum for conducting business at a meeting of stockholders requires the presence in person or proxy of a majority of the shares entitled to vote. *See* 8 *Del. C.* § 216(1). After the 2023 Amendments, and assuming no abstentions or non-votes, an amendment to increase the authorized shares could pass with the affirmative vote of just 25.1% of the shares. With shares abstaining or not voting, even lower percentages could carry the day.

Not only that, the DGCL authorizes a corporation to provide in its charter or bylaws that as few as one third of its shares constitutes a quorum for conducting business. *Id.* At that level, and again assuming no abstentions or non-votes, an amendment to increase the authorized shares could pass with the affirmative vote of as few as 16.7% of the shares. Here too, with shares abstaining or not voting, even lower percentages could carry the day.

The Delaware General Assembly enacted the 2023 Amendments. After the Governor signed them, new Section 242(d) became effective on August 1, 2023.

C.     **The Company Seeks To Increase Its Authorized Shares**

On September 27, 2024, the Company filed its definitive proxy statement for its annual meeting. The proxy statement sought stockholder approval for a charter amendment that would increase the authorized shares of common stock from 1,198,000,000 to 1,416,000,000 (the "Proposed Amendment").[3]

---

[3] The Company previously increased its number of authorized shares in 2023 using the Majority-of-the-Votes-Cast Standard. The plaintiff challenges the 2023

The proxy statement advised stockholders that the Majority-of-the-Votes-Cast Standard applied to the Proposed Amendment. Consequently, abstentions, broker non-votes, and shares not present at the meeting would have no effect.

## D.    This Litigation

On October 21, 2024, the plaintiff sent a letter to the Company asserting that the proxy statement misstated the applicable voting standard. Relying on the Single Vote Provision, the plaintiff asserted that the Proposed Amendment had to satisfy the Majority-of-the-Outstanding Standard.

On October 31, 2024, the plaintiff filed this action. He seeks a preliminary injunction blocking the Company from proceeding with the vote on the Proposed Amendment unless and until the directors issue disclosures stating that the Proposed Amendment must satisfy the Majority-of-the-Outstanding Standard.

The defendants cross-moved for summary judgment. The parties agree that their dispute presents the following question of law: What voting standard do Section 242(d) and the Single Vote Provision require for the Proposed Amendment? This decision therefore analyzes the issue through the lens of the summary judgment motion.

---

increase as well. The same analysis applies, so for simplicity, this decision focuses on the Proposed Amendment.

## II.     LEGAL ANALYSIS

A court may grant summary judgement only when "there is no genuine issue as to any material fact," and the "moving party is entitled to judgement as a matter of law." Ct. Ch. R. 56(a). Summary judgement is appropriate where the issue is the construction of a legal document, such as a certificate of incorporation. *See, e.g.*, *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992). Summary judgment is also well-suited to resolve issues of statutory interpretation. *See, e.g.*, *Salzberg v. Sciabacucchi*, 227 A.3d 102, 112 (Del. 2020) ("Statutory interpretation is a question of law[.]").

This case requires interpreting a statute and the Company's charter. Summary judgment is an appropriate vehicle for resolving the case.

Summary judgment remains an appropriate vehicle even though this decision finds that Section 242(d) is ambiguous. That means the court must consider extrinsic evidence, which in many cases gives rise to disputes of fact. But when interpreting a statute, a court does not look to the types of extrinsic evidence that often give rise to disputes of fact, such as the negotiating history in a contract cases. Here, the sources of extrinsic evidence are undisputed. Having considered those sources, this decision concludes that the Majority-of-the-Votes-Cast Standard applies to the Proposed Amendment.

8

**A.    Principles Of Statutory And Contract Interpretation**

This case requires the application of principles of statutory and contract interpretation. The two bodies of law largely parallel each other. Each looks first for plain meaning, then turns to extrinsic evidence to resolve ambiguity.

Under Delaware law, "[t]he goal of statutory construction is to determine and give effect to the legislative intent." *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999). As a starting point, a court applying Delaware law "must seek to ascertain and give effect to the intention of the Legislature as expressed in the Statute itself." *Keys v. State*, 337 A.2d 18, 22 (Del. 1975).

"[I]f a statute is clear and unambiguous, the plain meaning of the statutory language controls." *Shawe v. Elting*, 157 A.3d 152, 164 (Del. 2017) (internal quotation marks omitted). A statute is unambiguous "where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." *Friends of H. Fletcher Brown Mansion v. City of Wilm.*, 34 A.3d 1005, 1059 (Del. 2011) (cleaned up).

To discern the plain meaning of statutory language, the Delaware Code instructs that "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language." 1 *Del. C.* § 303. "[W]here the intent of the legislature is clearly reflected by unambiguous language in the statute, the language itself controls." *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 494 (Del. 2000) (internal quotation marks omitted).

9

A statute "is ambiguous if it is susceptible of two reasonable interpretations." *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del. 2011). A statute is not ambiguous simply because the parties disagree about its meaning. *Ross v. State*, 990 A.2d 424, 429 (Del. 2010)

When a statute is ambiguous, courts applying Delaware law "consider the statute as a whole, rather than in parts, and . . . read each section in light of all others to produce a harmonious whole." *Taylor*, 14 A.3d at 538. When a statute is "'reasonably susceptible' of different conclusions or interpretations, [the courts] normally consider extrinsic evidence, such as legislative history and any historical applications of the text at issue." *Jack Lingo Asset Mgmt., LLC v. Bd. of Adjustment of Rehoboth Beach*, 282 A.3d 29, 33 (Del. 2022). A court may also apply canons of statutory construction to resolve ambiguities. *See also Director of Revenue v. Verisign, Inc.*, 267 A.3d 371, 377 (Del. 2021) ("If there is a legitimate ambiguity, we consult the canons of statutory construction and may consider legislative history.").

Parallel principles apply to contracts and, hence, to certificates of incorporation. Under Delaware law, "[c]ertificates of incorporation are regarded as contracts between the shareholders and the corporation, and are judicially interpreted as such." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). That means certificates of incorporation are "interpreted using standard rules of contract interpretation which require a court to determine from the language of the contract intent of the parties." *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996). To discern the intent of the parties, "the Certificate should be read

10

as a whole and, if possible, interpreted to reconcile all of the provision of the document." *Id.* The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. *Id.*

If the contract is unambiguous, "the Court must give effect to [its] clear language." *Id.* "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). "[A] a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.*

If a contract is ambiguous, then a court must look beyond its language to determine what a reasonable observer would think the parties intended. *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834–35 (Del. Ch. 2007). If the ambiguity appears "in a negotiated bilateral agreement, extrinsic evidence should be considered if it would tend to help the court interpret such a provision." *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998). But if one party has drafted a contract unilaterally and presented it on a take-it-or-leave-it basis, then any ambiguities "must be construed against [the party] drafting and presenting" the agreement. *Id.* at 42. That interpretive rule applies because a court looks to extrinsic evidence with the expectation that the evidence provides insight into the parties' shared understanding. *See id.* at 43 "Therefore, unless extrinsic evidence can speak to the

11

intent of *all* parties to a contract, it provides an incomplete guide with which to interpret contractual language." *Id.*

The interpretative principle in which ambiguities are construed against the drafter is known as *contra proferentem. See, e.g., Bank of N.Y. Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 551–52 (Del. 2013). That doctrine applies with particular force to cases involving stockholder voting rights that appear in a certificate of incorporation or the bylaws and where "the ultimate purchaser of the securities is not a party to the drafting of the instrument which determines her rights." *Kaiser*, 681 A.2d at 395. Thus, if management has drafted an ambiguous provision addressing voting rights—or a related subject like nomination rights, then the court does not look to extrinsic evidence to resolve the ambiguity but rather applies the principle of *contra proferentem* to reach a result consistent with the stockholders' expectations. *Harrah's Ent., Inc. v. JCC Hldg Co.*, 802 A.2d 294, 311–12 (Del. Ch. 2002); *accord Centaur P'rs, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 924–27 (Del. 1990) (requiring limitations on voting rights be "clear and unambiguous").

**B.    The Current Section 242 Framework**

Section 242 governs amendments to a corporation's charter after the corporation has received payment for its stock. Section 242(a) identifies examples of permissible charter amendments. Section 242(b) describe a process that a corporation must follow to adopt an amendment and asserts that "[e]very amendment authorized by subsection (a) of this section shall be made and effected in the following manner."

12

8 *Del. C.* § 242(b). Since the adoption of Section 242(d), that statement is no longer true. Some amendments to increase or decrease the authorized shares can be made and effected as authorized by Section 242(d).

Section 242(b) identifies the generally required steps for approving and implementing a charter amendment. Under Section 242(b)(1), the board must first approve the amendment. Then the board must submit the amendment to the stockholders, and the holders of majority of the outstanding stock must approve the amendment.[4] In other words, the amendment must meet the Majority-of-the-Outstanding Standard. That is the first statutorily required vote under the pre-amendment Section 242(b) regime (the "Majority-of-the-Outstanding Requirement").

But that is not the only statutorily required vote that Section 242(b) imposes. Section 242(b)(2) introduces another required vote:

> The holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, if the amendment would increase or decrease the aggregate number of authorized shares of such class, increase or decrease the par value of the shares of such class, or alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely.

---

[4] A corporation's charter may increase the percentage of the outstanding shares required to approve the amendment. 8 *Del. C.* § 102(b)(4). A corporation's charter may also require other approvals, such as a class or series vote. *Id.* After the Market Practice Amendments of 2024, a corporation can agree in a contract with a current or prospective stockholder to require additional approvals from specified "persons or bodies," which may include but are not limited to "the board of directors or 1 or more current or future directors, stockholders or beneficial owners of stock of the corporation." *See* 8 *Del. C.* § 122(18).

8 *Del. C.* § 242(b)(2). Under that provision, if the amendment would increase the authorized shares of any class of stock, then the corporation must obtain approval for the amendment from a majority of the shares in that class, voting as a separate class. That is the second required vote (the "Majority-of-the-Class Requirement").

The last sentence of Section 242(b)(2), however, creates an optional path for dispensing with the Majority-of-the-Class Requirement for amendments that increase or decrease the authorized shares of a class. That sentence states:

> The number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote irrespective of this subsection, if so provided in the original certificate of incorporation, in any amendment thereto which created such class or classes of stock or which was adopted prior to the issuance of any shares of such class or classes of stock, or in any amendment thereto which was authorized by a resolution or resolutions adopted by the affirmative vote of the holders of a majority of such class or classes of stock.

*Id.* (the "Class Vote Opt-Out"). If a corporation has adopted a provision implementing the Class Vote Opt-Out, then the Majority-of-the-Class Requirement no longer applies. In that scenario, a corporation can increase the authorized shares of a class of stock by satisfying only the Majority-of-the-Outstanding Requirement.

That was the entire statutory scheme before the 2023 Amendments. Then came Section 242(d). For purposes of this case, the pertinent language of Section 242(d) states:

> Notwithstanding the provisions of subsection (b) of this section, unless otherwise expressly required by the certificate of incorporation:
>
> . . .

14

(2) An amendment to increase . . . the authorized number of shares of a class of capital stock . . . may be made and effected, without obtaining the vote or votes of stockholders otherwise required by subsection (b) of this section if:

(A) the shares of such class are listed on a national securities exchange immediately before such amendment becomes effective and meet the listing requirements of such national securities exchange relating to the minimum number of holders immediately after such amendment becomes effective,

(B) at a meeting called in accordance with paragraph (b)(1) of this section, a vote of the stockholders entitled to vote thereon, voting as a single class, is taken for and against the proposed amendment, and the votes cast for the amendment exceed the votes cast against the amendment, and

(C) if the amendment increases . . . the authorized number of shares of a class of capital stock for which no provision has been made pursuant to the last sentence of paragraph (b)(2) of this section, the votes cast for the amendment by the holders of such class exceed the votes cast against the amendment by the holders of such class.

8 *Del. C.* § 242(d) (formatting added).

Under this structure, Section 242(b) no longer establishes the statutorily required votes to increase the authorized shares when a corporation can satisfy the criteria in Section 242(d)(2)(A). By stating that the lower voting standard in Section 242(d)(2) applies "[n]otwithstanding the provisions of subsection (b) of this section" and that a corporation can proceed under Section 242(d)(2) "without obtaining the vote or votes of stockholders otherwise required by subsection (b) of this section," Section 242(d)(2) eliminates the need to comply with Section 242(b) in that setting.

When Section 242(d)(2) applies, Section 242(d)(2)(B) imposes a Majority-of-the-Votes-Cast Standard: The corporation only needs approval from "the stockholders entitled to vote thereon, voting as a single class," with the operative voting standard

15

being whether "the votes cast for the amendment exceed the votes cast against the amendment" (the "Majority-of-the-Votes-Cast Requirement").

But like Section 242(b)(2), Section 242(d)(2) preserves the possibility of a class vote. Section 242(d)(2)(C) envisions two settings: (i) a corporation that has not taken advantage of the Class Vote Opt-Out and (ii) a corporation that has taken advantage of the Class Vote Opt-Out. It is somewhat strange for Section 242(d)(2) to turn on an optional provision in a subsection that Section 242(d) twice says no longer applies, but that is what Section 242(d)(2)(C) does.

Under Section 242(d)(2)(C), if "no provision has been made pursuant to the last sentence of paragraph (b)(2) of this section" then the corporation must obtain a class vote using the Majority-of-the-Votes-Cast Standard. Implicitly, if "provision has been made pursuant to the last sentence of paragraph (b)(2) of this section," then the additional vote does not apply, and the only vote required is the Majority-of-the-Votes-Cast Requirement.

Put differently, by twice saying that the votes required by Section 242(b) do not apply, Section 242(d) eliminates the requirement for the class vote contemplated by Section 242(b)(2). Section 242(d)(2)(C) thus accomplishes two things. First, it restores the class vote for a class of shares "for which no provision has been made pursuant to the last sentence of paragraph (b)(2) of this section." Second, it provides that for purposes of the class vote, the Majority-of-the-Votes-Cast Standard applies, not the Majority-of-the-Outstanding Standard specified in Section 242(b)(2).

16

Unfortunately, Section 242(d) does not elaborate on how to determine whether "provision has been made pursuant to the last sentence of paragraph (b)(2) of this section." A charter provision stating only that all shares of stock vote together for purposes of a vote to increase or decrease the authorized shares of any class of stock would satisfy Section 242(d)(2)(C) without raising any other interpretive issues. But once a charter provision says more, such as by referencing a voting standard explicitly, then tension arises. Does the provision "otherwise expressly require[]" a different vote, or is the language merely making "provision . . . pursuant to the last sentence of paragraph (b)(2)"?

## C.   The Dispute In This Case

This case exists because the parties disagree about the effect of the Single Vote Provision. The plaintiff argues that the Single Vote Provision expressly requires that the Company apply the Majority-of-the-Outstanding Standard. The defendants argue that the Single Vote Provision is merely a "provision . . . made pursuant to the last sentence of paragraph (b)(2)," such that its sole effect is to render inapplicable the class vote otherwise required by Section 242(d)(2)(C). They say they are properly applying the Majority-of-the-Votes-Cast Standard. Both readings are reasonable, creating ambiguity.

To resolve the ambiguity, the court must look to sources of evidence beyond the statutory text. In this case, those sources point in the defendants' favor. The Majority-of-the-Votes-Cast Standard governs the Proposed Amendment.

17

### 1. The Plaintiff's Reading

The plaintiff contends that the Single Vote Provision opts out of Section 242(d). Under Section 242(d), the Majority-of-the-Votes-Cast Requirement applies "unless otherwise expressly required by the certificate of incorporation." The plaintiff contends that the Single Vote Provision "otherwise expressly require[s]" that the Company apply the Majority-of-the-Outstanding Standard. That is one reasonable reading.

The plaintiff relies on standard definitions of "expressly." Citing Black's Law Dictionary, the plaintiff argues that something is express when it is "[c]learly and unmistakably communicated; stated with directness and clarity." *Express*, Black's Law Dictionary (12th ed. 2024). The plaintiff asserts that for a charter provision to expressly require a particular vote, the charter need only (i) identify an issue and (ii) specify a voting standard. *See* PRB at 1.

The plaintiff maintains that the Single Vote Provision meets this test. For purposes of this case, the pertinent language of the Single Vote Provision states:

> The number of authorized shares of Common Stock or Preferred Stock may be increased . . . by the affirmative vote of the holders of a majority of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon, without a vote of the holders of the Preferred Stock, or of any series thereof, or Common Stock . . . .

The Single Vote Provision thus identifies an issue ("[t]he number of authorized shares of Common Stock or Preferred Stock may be increased") and specifies a voting standard (the "affirmative vote of the holders of a majority of the voting power of all of the outstanding shares"). The plaintiff concludes that the Single Vote Provision

18

therefore "expressly require[s]" a different voting standard than Section 242(d)(2)(B). To reiterate, that is a reasonable reading.

The defendants offer two responses, both of which hinge on "expressly required." One response emphasizes "expressly." The other emphasizes "requires." Neither is persuasive.

### a.    The Debate Over "Expressly"

The defendants argue that the DGCL uses adverbs like "explicitly," "specifically," or "expressly" to require that a charter use particularly specific language. *See* DRB at 6. They assert that "the word 'expressly,' when read in the context of the statute as a whole, requires the certificate of incorporation to explicitly opt out of the provisions of Section 242(d)." DRB at 4–5. For the defendants, that means a provision must refer to the section it modifies. For purposes of Section 242(d), it means that the provision must contain language which, in substance, says:

> Notwithstanding the language of Section 242(d)(2), the number of authorized shares of Common Stock or Preferred Stock may be increased . . . by the affirmative vote of the holders of a majority of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon.

But while referring to Section 242(d)(2) would make a provision more clear, using "expressly" in the introductory clause of Section 242(d) does not impose such a requirement. The three adverbs—explicitly, specifically, and expressly—simply require that the charter state the proposition affirmatively, rather than a court inferring the proposition from context.

19

Start with "explicitly," which appears just twice in the DGCL. The first time is in Section 102(d), which states: "[A]ny provision of the certificate of incorporation may be made dependent upon facts ascertainable outside such instrument, provided that the manner in which such facts shall operate upon the provision is clearly and explicitly set forth therein." That provision uses "explicitly" as the opposite of "implicitly." It means the provision must say how the "facts ascertainable" work. The adverb does not require a reference to Section 102(d).

The other time is in Section 145(f), which states:

> A right to indemnification or to advancement of expenses . . . shall not be eliminated or impaired by [its] amendment to or repeal or elimination . . . after the occurrence of the act or omission that is the subject of the . . . proceeding for which indemnification or advancement of expenses is sought, unless the provision in effect at the time of such act or omission explicitly authorizes such elimination or impairment after such action or omission has occurred.

Here too, "explicitly" is the opposite of "implicitly." It means the provision must say the right can be eliminated or impaired by a post-proceeding amendment. The adverb does not require a reference to Section 145(f).

Next comes "specifically," which appears eleven times in the DGCL. None of the appearances requires a specific reference to a particular section.

- Section 103(e): "If another section of this chapter specifically prescribes a manner of executing, acknowledging or filing a specified instrument or a time when such instrument shall become effective which differs from the corresponding provisions of this section, then such other section shall govern."

- Section 103(f): An instrument corrected using a certificate of correction "shall be specifically designated as such in its heading, shall specify the inaccuracy or defect to be corrected, and shall set forth the entire instrument in corrected form."

20

- Section 144(a)(2): An interested transaction is not void or voidable if "the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders."

- Section 211(c): "A failure to hold the annual meeting at the designated time or to elect a sufficient number of directors to conduct the business of the corporation shall not affect otherwise valid corporate acts or work a forfeiture or dissolution of the corporation except as may be otherwise specifically provided in this chapter."

- Section 245(c): "A restated certificate of incorporation shall be specifically designated as such in its heading."

- Section 262(h): "After the Court determines the persons entitled to an appraisal, the appraisal proceeding shall be conducted in accordance with the rules of the Court of Chancery, including any rules specifically governing appraisal proceedings."

- Section 311(a)(4): A certificate revoking a corporate dissolution "shall be executed, acknowledged and filed in accordance with § 103 of this title, which shall be specifically designated as a certificate of revocation of dissolution or a certificate of restoration in its heading."

- Section 391(a)(7): "For receiving and filing and/or indexing any certificate, affidavit, agreement or any other paper provided for by this chapter, for which no different fee is specifically prescribed, a fee of $115 in each case shall be paid to the Secretary of State."

- Section 617: "The use of the word 'company,' 'corporation' or 'incorporated' or any other word, words, abbreviations, affix or prefix indicating that it is a corporation, in the corporate name of a professional corporation is specifically prohibited."

None of these provision use "specifically" as if it were a term of art. Consistent with the adverb's plain English meaning, they simply call for saying something outright.

Only two sections in the DGCL use "specifically" in connection with a corporation's ability to depart from an otherwise applicable rule.

- Section 355(b): A close corporation may amend its charter to grant any stockholder the right to compel dissolution if the provision is "adopted by the

21

affirmative vote of the holders of all the outstanding stock, whether or not entitled to vote, unless the certificate of incorporation specifically authorizes such an amendment by a vote which shall be not less than 2/3 of all the outstanding stock whether or not entitled to vote."

- Section 612: "The certificate of incorporation [of a close corporation] may provide specifically for additional restraints on the alienation of shares, including the redemption or purchase of such shares by the professional corporation at prices and in a specific manner, or the bylaws of the professional corporation . . . ."

Both provisions use "specifically" to require language affirmatively stating the proposition in question. Like "explicitly," the DGCL uses "specifically" to mean the opposite of "implicitly." That's all.

Of the three adverbs, the word "expressly" is the most common, appearing fifty-two times in the DGCL.[5] The adverb appears nine times in provisions addressing the certificate of incorporation.

- Section 102(b)(3): "No stockholder shall have any preemptive right to subscribe to an additional issue of stock or to any security convertible into such stock unless, and except to the extent that, such right is expressly granted to such stockholder in the certificate of incorporation."

- Section 116(b)(7): "No provision of the certificate of incorporation or bylaws shall limit the application of subsection (a) of this section except for a provision that expressly restricts or prohibits the use of an electronic transmission or electronic signature (or any form thereof) or expressly restricts or prohibits the delivery of an electronic transmission to an information processing system."

---

[5] In addition to the nine appearances identified above the line, the other forty-three are: Sections 102(b)(3)), 116(b)(4), 127, 141(c)(2), 147, 151(a) (appearing three times), 151 (f), 151 (g), 152(c), 157 (d), 203(b)(1), 203(b)(2), 203(b)(3), 203(c)(3)(v), 217(a), 242(d), 251(b), 251(h)(1), 252(b), 253(a), 254(c), 255(b), 256(b), 257(b), 261(a), 262(d)(1), 262(d)(2), 262(e), 263(b), 264(b), 265(k), 266 (l), 267(a), 268(b), 379(b), 388(l), 389(b), 389(c)(4)(e), 389(f), 390(j), 390(k). Those provisions use "expressly" consistent with the explanation in the text.

22

- Section 141(c)(1): "[U]nless the resolution, bylaws or certificate of incorporation expressly so provides, no such committee shall have the power or authority to declare a dividend, to authorize the issuance of stock or to adopt a certificate of ownership and merger pursuant to § 253 of this title."

- Section 266(k): "Any provision of the certificate of incorporation of a corporation incorporated before August 1, 2022, or any provision in any voting trust agreement or other written agreement between or among any such corporation and 1 or more of its stockholders in effect on or before August 1, 2022, that restricts, conditions or prohibits the consummation of a merger or consolidation shall be deemed to apply to a conversion as if it were a merger or consolidation unless the certificate of incorporation or such agreement expressly provides otherwise."

- Section 251(g): "Notwithstanding the requirements of subsection (c) of this section, unless expressly required by its certificate of incorporation, no vote of stockholders of a constituent corporation shall be necessary if [specific requirements are met]."

- Section 251(h): "Notwithstanding the requirements of subsection (c) of this section, unless expressly required by its certificate of incorporation, no vote of stockholders of a constituent corporation . . . shall be necessary to authorize a merger if [specific requirements are met]."

- Section 253(a): "In any case in which . . . at least 90% of the outstanding shares of each class of the stock of a corporation or corporations (other than a corporation which has in its certificate of incorporation the provision required by § 251(g)(7)(A) and (B) of this title) . . . Any of the terms of the resolution of the board of directors to so merge may be made dependent upon facts ascertainable outside of such resolution, provided that the manner in which such facts shall operate upon the terms of the resolution is clearly and expressly set forth in the resolution."

- Section 272(d): "A provision of the certificate of incorporation that requires the authorization or consent of stockholders for a sale, lease or exchange of property or assets shall not apply to a transaction permitted by subsection (b) of this section unless such provision expressly so requires; provided that this subsection (d) shall apply only to certificate of incorporation provisions that first become effective on or after August 1, 2023."

- Section 390(k): "Any provision of the certificate of incorporation of a corporation incorporated before August 1, 2023, . . . that restricts, conditions or prohibits the consummation of a merger or consolidation shall be deemed to apply to a transfer, domestication or continuance … unless the certificate of incorporation . . . expressly provides otherwise with respect to a transfer,

23

domestication or continuance or, if the certificate of incorporation . . . does not so expressly provide, a conversion, in which case such express provision shall be deemed to apply to a transfer, domestication or continuance as if it were a conversion."

As with "explicitly" and "specifically," the uses of "expressly" do not indicate anything other than a need for the certificate to address the issue the statute contemplates. The adverb "expressly" signals that a particular concept should not be implied.

The defendants fare no better by shifting from "expressly" to "expressly required." *See* Tr. at 28. That exact phrase appears only four times in the DGCL: once in Section 242(d) and three times in Section 251. The defendants infer that the Council reserves "expressly required" for extra significant sections, but there are equally significant sections that contemplate opt-outs without adverbs, defeating the defendants' argument.

The DGCL contains many provisions that address the ability to use the charter to alter a governance provision.[6] As the following list shows, the DGCL uses a variety of formulations to express that possibility. Contrary to the defendants' position, there is no pattern in the use or omission of adverbs that would suggest a particular distinction in meaning.

- Section 102(b)(2): A corporation can pursue a particular method of reorganization if its certificate of incorporation contains the specified statutory language "in haec verba."

- Section 102(b)(7): "All references in this paragraph (b)(7) to a director shall also be deemed to refer to such other person or persons, if any, who, pursuant to a

---

[6] The list only includes provisions governing corporations authorized to issue capital stock. It does not include provisions governing non-stock corporations.

24

provision of the certificate of incorporation in accordance with § 141(a) of this title, exercise or perform any of the powers or duties otherwise conferred or imposed upon the board of directors by this title."

- Section 108(c): "Unless otherwise restricted by the certificate of incorporation, (1) any action permitted to be taken at the organization meeting of the incorporators or directors, as the case may be, may be taken without a meeting if each incorporator or director, where there is more than 1, or the sole incorporator or director where there is only 1, consents thereto . . . ."

- Section 122(1): "Every corporation created under this chapter shall have power, whether or not so provided in the certificate of incorporation, to: (1) Have perpetual succession by its corporate name, unless a limited period of duration is stated in its certificate of incorporation . . . ."

- Section 125: "No corporation organized after April 18, 1945, shall have power to confer academic or honorary degrees unless the certificate of incorporation or an amendment thereof shall so provide . . . ."

- Section 125: "Notwithstanding any provision herein to the contrary, no corporation shall have the power to conduct a private business or trade school unless the certificate of incorporation or an amendment thereof, prior to its being filed in the office of the Secretary of State, shall have endorsed thereon the approval of the Department of Education pursuant to Chapter 85 of Title 14."

- Section 131(b): "Whenever the term 'corporation's principal office or place of business in this State' or 'principal office or place of business of the corporation in this State,' or other term of like import, is or has been used in a corporation's certificate of incorporation, or in any other document, or in any statute, it shall be deemed to mean and refer to, unless the context indicates otherwise, the corporation's registered office required by this section; and it shall not be necessary for any corporation to amend its certificate of incorporation or any other document to comply with this section."

- Section 132(h): "Whenever the term 'resident agent' or 'resident agent in charge of a corporation's principal office or place of business in this State,' or other term of like import which refers to a corporation's agent required by statute to be located in this State, is or has been used in a corporation's certificate of incorporation, or in any other document, or in any statute, it shall be deemed to mean and refer to, unless the context indicates otherwise, the corporation's registered agent required by this section . . . ."

- Section 141(a): "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors,

except as may be otherwise provided in this chapter or in its certificate of incorporation."

- Section 141(b): "The number of directors shall be fixed by, or in the manner provided in, the bylaws, unless the certificate of incorporation fixes the number of directors . . . ."

- Section 141(b): "A majority of the total number of directors shall constitute a quorum for the transaction of business unless the certificate of incorporation or the bylaws require a greater number."

- Section 141(b): "Unless the certificate of incorporation provides otherwise, the bylaws may provide that a number less than a majority shall constitute a quorum which in no case shall be less than ⅓ of the total number of directors."

- Section 141(b): "The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors unless the certificate of incorporation or the bylaws shall require a vote of a greater number."

- Section 141(c)(3): "Unless otherwise provided in the certificate of incorporation, the bylaws or the resolution of the board of directors designating the committee, a committee may create 1 or more subcommittees . . . ."

- Section 141(c)(4): "A majority of the directors then serving on a committee of the board of directors or on a subcommittee of a committee shall constitute a quorum for the transaction of business by the committee or subcommittee, unless the certificate of incorporation, the bylaws, a resolution of the board of directors or a resolution of a committee that created the subcommittee requires a greater or lesser number . . . ."

- Section 141(c)(4): "The vote of the majority of the members of a committee or subcommittee present at a meeting at which a quorum is present shall be the act of the committee or subcommittee, unless the certificate of incorporation, the bylaws, a resolution of the board of directors or a resolution of a committee that created the subcommittee requires a greater number."

- Section 141(d): "Any such provision conferring greater or lesser voting power [on directors] shall apply to voting in any committee, unless otherwise provided in the certificate of incorporation or bylaws."

- Section 141(f): "Unless otherwise restricted by the certificate of incorporation or bylaws, (1) any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting if all members of the board or committee, as the case may be, consent

26

thereto in writing, or by electronic transmission, and (2) a consent may be documented, signed and delivered in any manner permitted by § 116 of this title."

- Section 141(g): "Unless otherwise restricted by the certificate of incorporation or bylaws, the board of directors of any corporation organized under this chapter may hold its meetings, and have an office or offices, outside of this State."

- Section 141(h): "Unless otherwise restricted by the certificate of incorporation or bylaws, the board of directors shall have the authority to fix the compensation of directors."

- Section 141(i): "Unless otherwise restricted by the certificate of incorporation or bylaws, members of the board of directors of any corporation, or any committee designated by the board, may participate in a meeting of such board, or committee by means of conference telephone or other communications equipment."

- Section 141(k)(1): "Unless the certificate of incorporation otherwise provides, in the case of a corporation whose board is classified as provided in subsection (d) of this section, stockholders may effect such removal only for cause."

- Section 142(a): "Any number of offices may be held by the same person unless the certificate of incorporation or bylaws otherwise provide."

- Section 145(f): "A right to indemnification or to advancement of expenses arising under a provision of the certificate of incorporation or a bylaw shall not be eliminated or impaired by an amendment to or repeal or elimination of the certificate of incorporation or the bylaws after the occurrence of the act or omission that is the subject of the . . . action, suit or proceeding for which indemnification or advancement of expenses is sought, unless the provision in effect at the time of such act or omission explicitly authorizes such elimination or impairment after such action or omission has occurred."

- Section 151(g): "Unless otherwise provided in the certificate of incorporation, if no shares of stock have been issued of a class or series of stock established by a resolution of the board of directors, the voting powers, designations, preferences and relative, participating, optional or other rights, if any, or the qualifications, limitations or restrictions thereof, may be amended by a resolution or resolutions adopted by the board of directors."

- Section 153(d): "If the certificate of incorporation reserves to the stockholders the right to determine the consideration for the issue of any shares, the

stockholders shall, unless the certificate requires a greater vote, do so by a vote of a majority of the outstanding stock entitled to vote thereon."

- Section 160(a)(3): "[N]o corporation shall . . . redeem any of its shares, unless their redemption is authorized by § 151(b) of this title and then only in accordance with such section and the certificate of incorporation . . . ."

- Section 161: "The directors may, at any time and from time to time, if all of the shares of capital stock which the corporation is authorized by its certificate of incorporation to issue have not been issued, subscribed for, or otherwise committed to be issued, issue or take subscriptions for additional shares of its capital stock up to the amount authorized in its certificate of incorporation."

- Section 211(b): "Stockholders may, unless the certificate of incorporation otherwise provides, act by written consent to elect directors . . . ."

- Section 211(e): "All elections of directors shall be by written ballot unless otherwise provided in the certificate of incorporation . . . ."

- Section 212: "Unless otherwise provided in the certificate of incorporation and subject to § 213 of this title, each stockholder shall be entitled to 1 vote for each share of capital stock held by such stockholder."

- Section 216: "Subject to this chapter in respect of the vote that shall be required for a specified action, the certificate of incorporation or bylaws of any corporation authorized to issue stock may specify the number of shares and/or the amount of other securities having voting power the holders of which shall be present or represented by proxy at any meeting in order to constitute a quorum for, and the votes that shall be necessary for, the transaction of any business . . . . In the absence of such specification [the following standards apply]."

- Section 223(a): "Unless otherwise provided in the certificate of incorporation or bylaws, [the following rules for filling vacancies apply]."

- Section 223(d): "Unless otherwise provided in the certificate of incorporation or bylaws, when 1 or more directors shall resign from the board, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies . . . ."

- Section 228(a): "Unless otherwise provided in the certificate of incorporation, any action required by this chapter to be taken at any annual or special meeting of stockholders of a corporation . . . may be taken without a meeting, without prior notice and without a vote . . . ."

- Section 229: "Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors or members of a committee of directors need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the certificate of incorporation or the bylaws."

- Section 231(e): "Unless otherwise provided in the certificate of incorporation or bylaws, this section shall not apply to a corporation that [meets specific criteria]."

- Section 242(b)(2): "The number of authorized shares of any such class or classes of stock may be increased or decreased . . . by the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote irrespective of this subsection, if so provided in the original certificate of incorporation [or in other identified ways]."

- Section 243(b): "Whenever any shares of the capital stock of a corporation are retired, they shall resume the status of authorized and unissued shares of the class or series to which they belong unless the certificate of incorporation otherwise provides."

- Section 271(c): "Notwithstanding subsection (a) of this section, except to the extent the certificate of incorporation otherwise provides, no resolution by stockholders or members shall be required for a sale, lease or exchange of property and assets of the corporation to a subsidiary."

- Section 272(a): "The authorization or consent of stockholders to the mortgage or pledge of a corporation's property and assets shall not be necessary, except to the extent that the certificate of incorporation otherwise provides."

- Section 273(a): "If the stockholders of a corporation of this State, having only 2 stockholders each of which own 50% of the stock therein, shall be engaged in the prosecution of a joint venture and if such stockholders shall be unable to agree upon the desirability of discontinuing such joint venture . . . either stockholder may, unless otherwise provided in the certificate of incorporation of the corporation or in a written agreement between the stockholders, file [for dissolution]."

- Section 355(b): "If the certificate of incorporation [of a close corporation] as originally filed does not contain a provision authorized by subsection (a) of this section, the certificate may be amended to include such provision [if certain requirements are met], unless the certificate of incorporation specifically authorizes such an amendment by a vote which shall be not less than 2/3 of all the outstanding stock whether or not entitled to vote."

- Section 365(c): "[N]o failure to satisfy that balancing requirement shall, for the purposes of § 102(b)(7) or § 145 of this title, constitute an act or omission not in good faith, or a breach of the duty of loyalty, unless the certificate of incorporation so provides."

- Section 390(d): "Unless otherwise agreed or otherwise provided in the certificate of incorporation, the transfer, domestication or continuance of a corporation out of the State of Delaware in accordance with this section shall not require such corporation to wind up its affairs or pay its liabilities and distribute its assets under this title and shall not be deemed to constitute a dissolution of such corporation."

- Section 604: "This chapter shall not apply to . . . any corporations [that meets certain criteria] . . . unless . . . any such corporation [amends] the certificate of incorporation, in a manner so as to be consistent with all the provisions of this chapter, and by affirmatively stating in the amended certificate of incorporation that the shareholders have elected to bring the corporation within this chapter, or be incorporated initially under this chapter."

- Section 610: "Subject to the professional corporation's certificate of incorporation, the estate of a shareholder [that meets certain criteria] may continue to hold stock pursuant to the certificate of incorporation for a reasonable period . . . ."

- Section 613: "If the certificate of incorporation or bylaws of a professional corporation . . . fails to fix a price at which a professional corporation or its shareholders may purchase the shares of a deceased, retired, expelled or disqualified shareholder, and if the certificate of incorporation or bylaws or such contract do not otherwise provide, then the price for the share or shares shall be [as specified in the statute]."

None of these sections requires an adverb to convey the message that the charter must address a particular issue.

Viewing these provisions as a whole reveals the absence of any discernable pattern to how the DGCL addresses the possibility of using the certificate of incorporation to depart from an otherwise applicable rule. Indeed, the sections in which the DGCL refers to a charter-based opt out without using an adverb like "explicitly," "specifically," or "expressly" raises questions about what those adverbs

30

add. The certificate of incorporation is a written document, so to include something in the certificate of incorporation requires doing so through language, *viz.* "explicitly," "specifically," or "expressly." It is hard to see how the meaning of any provision that includes an adverb would change if the adverb were omitted, or *vice versa.*

To be sure, a court will strive to give meaning to every term in a statute or contract, rather than rendering terms superfluous. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotation marks omitted); *see Taylor*, 14 A.3d at 540 ("To the extent possible, we construe statutory language against surplusage, and assume the General Assembly used particular text purposefully."). "But the canon against surplusage merely favors that interpretation which *avoids* surplusage." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012). The court's principal job is to consider the statute as a whole and discern the reasonable reading that implements the legislature's intent. On occasion, wringing dregs of meaning from a word or two can undermine the interpretation of the statute as a whole. Putting too much emphasis on the adverbial triumvirate risks that result.

And it is unnecessary to hang a landscape of meaning on three adverbial hooks. Those adverbs acquire sufficient meaning by regarding each as a signal that the charter must contain language addressing that particular issue and that a court should not infer a departure from the statutory rule based on other language in the charter or from reading the charter as a whole.

31

A contrast with other provisions in the Delaware Code reinforces that conclusion. Unlike in the DGCL, the statutes governing trusts and the obligations of trust fiduciaries do require language that expressly references a specific section:

- Section 3314 of Title 12: "This section shall not apply to . . . (4) A trust under a governing instrument that by specific reference expressly rejects the application of this section." 12 *Del. C.* § 3314(b)(4).

- Section 3345 of Title 12: "This section applies to any trust the governing instrument of which makes express reference to this section and states that this section, or any part of this section, shall apply." 12 *Del. C.* § 3345(a).

- Section 61-106 of Title 12: "This section shall . . . [apply] unless . . . (3) The governing instrument expressly prohibits use of this section by specific reference to the section or expressly states the trustor's intent that net income not be calculated as a unitrust amount. A provision in the governing instrument that 'The provisions of 12 Del. C. § 61-106, as amended, or any corresponding provision of future law, shall not be used in the administration of this trust.' or 'My trustee shall not determine the distributions to the income beneficiary as a unitrust amount.' or similar words reflecting such intent shall be sufficient to preclude the use of this section." 12 *Del. C.* § 61-106.

- Section 501 of Title 25: "Subsection (a) of this section shall not apply to the exercise of a power over property held in a trust (the 'first power') if the instrument of exercise of any such power makes express reference to this section and expressly states that the provisions of this subsection shall apply." 25 *Del. C.* § 501(b).

- Section 504 of Title 25: "Subsection (a) of this section shall not apply to the exercise of a power of appointment . . . if the instrument of exercise of the power makes express reference to subsection (a) of this section and expressly states that subsection (a) of this section shall not apply to the exercise of the power or makes express reference to § 501 of this title and expressly states that § 501 of this title shall apply to the exercise of the power." 25 *Del. C.* § 504(b).

The introductory clause in Section 242(d) does not contain similar language.[7]

---

[7] The approach taken in these provisions of the Delaware Code reflects a backdoor way of making a statutory change retroactive. By definition, provisions in a trust drafted before the new statutory section came into effect cannot reference that

The defendants are thus incorrect when arguing that using the word "expressly" means that the Single Vote Provision must reference Section 242(d) to satisfy its terms. Section 242(d) only requires that the opt-out be explicit rather than implicit. The defendants' arguments about "expressly" do not negate the plaintiff's reading of the Single Vote Provision. It remains reasonable to read the Single Vote Provision as sufficient to satisfy the "otherwise expressly required" language of Section 242(d).

### b. The Debate Over "Requires"

The defendants' second argument focuses on "requires." In their briefing, the defendants stressed the notion that that the phrase "expressly required" necessitates a provision that is hyper specific. At oral argument, the defendants pivoted to stressing that that the phrase "expressly required" contains the word "required." Therefore, the defendants argued, any provision opting out of Section 242(d) must use a verb connoting a requirement. That is not a reasonable reading of the statute.

The defendants' insistence on a verb connoting a requirement draws attention to the different ways of framing a mandatory provision. According to the defendants, the most straightforward way for a corporation to meet the "expressly requires" requirement would be for its charter to state something like: "Increasing the number

new statutory section. Requiring an express reference to a new section thus has the effect of altering all existing trusts to adopt the new statutory rule. If the drafters and the General Assembly want to make a statutory provision retrospective so that it amends all existing trust agreements, they should do so openly, rather than through this indirect mechanism.

33

of authorized shares of common stock *requires* the affirmative vote of a majority of the corporation's outstanding shares, with all classes of stock voting together as a single class." But the defendants agree that the verb "require" is not itself required, as long as the charter frames the provision as a requirement. Thus, a corporation also could opt out of Section 242(d) if its charter stated something like: "To increase the number of authorized shares of common stock, the corporation must obtain the affirmative vote of a majority of the corporation's outstanding shares, with all classes of stock voting together as a single class."

What does not do the trick, the defendants say, is the Single Vote Provision, because it says "may" rather than "must." To reiterate, it states: "The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares of Common Stock, or Preferred Stock then outstanding) by the affirmative vote of the holders of a majority of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon . . . ."

The Single Vote Provision plainly uses the word "may," and "may" is ordinarily permissive. *E.g.*, *Miller v. Spicer*, 602 A.2d 65, 67 (Del. 1991) ("The use of the verb 'shall' in legislation generally connotes a mandatory requirement while the verb 'may' is deemed permissive."). But in some contexts, "may" can lead to mandatory requirements. *E.g.*, *Mason v. Fearson*, 50 U.S. 248, 259 (1850) ("Where a statute directs the doing of a thing for the sake of justice or the public good, the word 'may' is the same as the word 'shall' . . . ."). "A term such as 'shall' or 'may' does not have an exclusive, fixed, or inviolate connotation, and its meaning in particular cases is

determined from the intent of the legislature as shown by the context within which the word appears." 3 *Sutherland Statutory Construction*, § 57:10. Verb forms (8th ed.).

"May" often leads to mandatory requirements when it describes a situation where discretion is limited. "A grant of discretion to do one thing doesn't necessarily equal a prohibition against doing other things." Kenneth A. Adams, *A Manual of Style for Contract Drafting* § 3.212 (5th ed. 2023).[8] But discretion can be limited, and "[t]he more specific a grant of discretion is, the more likely it is that the reader would conclude that the discretion is limited—otherwise there would be no point in being so specific." *Id.* § 3.213.

> Consider the sentence *Acme may sell the Shares to Ferguson*. Maybe the parties had in mind that Acme could sell the shares to anyone—they addressed sale to Ferguson explicitly simply because otherwise it would have been uncertain whether Acme could sell the shares to Ferguson. But the expectation of relevance suggests that if the parties mentioned only Ferguson when authorizing Acme to sell the shares, it's because Acme was precluded from selling the shares to anyone else.

*Id.* § 3.214. More generally, if an act is otherwise prohibited, but a provision states that a party "may" perform the act if certain criteria are met, then "may" becomes mandatory. The party can choose whether or not to proceed, but the party only "may" proceed by following the specified path.

---

[8] As its name implies, this treatise addresses contract drafting. But as discussed previously, both statutory interpretation and contract interpretation seek to understand the plain meaning of words and the potential for ambiguity. Many of Adams' insights about words in contracts apply equally to words in statutes.

A reasonable reading of the Single Vote Provision treats it as a grant of limited discretion. A corporation cannot simply increase its authorized shares on a whim; it must comply with the requirements in the DGCL and its governing documents, including its charter. The Single Vote Provision identifies a limited means by which the corporation "may" increase its authorized shares, namely "by the affirmative vote of the holders of a majority of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon." That empowering language is also sufficiently specific to connote a form of limited discretion. The Single Vote Provision does not imply that there are many ways to increase the authorized shares in addition to the possibility it identifies. A reasonable reading of the provision implies that increasing the authorized shares requires compliance with the Single Vote Provision.

The defendants are thus incorrect to argue that Section 242(d)'s use of the phase "expressly required" rules out the Single Vote Provision. It remains reasonable to read the Single Vote Provision as sufficient to satisfy the "otherwise expressly required" exception.

### 2. The Defendants' Reading

The defendants read the Single Vote Provision differently. They start with Section 242(d)(2)(C), which turns on whether the "provision has been made pursuant to the last sentence of paragraph (b)(2) of this section." The defendants argue that the Single Vote Provision is simply an example of that. The presence of the Single Vote Provision therefore addresses whether Section 242(d)(2)(C) requires a separate

36

class vote using the votes-cast standard, but it does not otherwise have any effect. That too is a reasonable reading of the Single Vote Provision.

The defendants' argument turns on the close similarity between Section 242(b)(2) and the Single Vote Provision. Recall that under Section 242(d)(2)(C),

> if the amendment increases or decreases the authorized number of shares of a class of capital stock for which no provision has been made pursuant to the last sentence of paragraph (b)(2) of this section, the votes cast for the amendment by the holders of such class exceed the votes cast against the amendment by the holders of such class.

8 *Del. C.* § 242(d)(2)(C). As noted previously, this provision envisions two states of the world, one in which a corporation has not taken advantage of the Class Vote Opt-Out and one in which a corporation has. If the corporation has taken advantage of the Class Vote Opt-Out, then Section 242(d)(2)(C) does not require the additional class vote. But if the corporation has not taken advantage of the Class Vote Opt-Out, then Section 242(d)(2)(C) requires the additional class vote.

The Single Vote Provision closely tracks the Class Vote Opt-Out. The key language states:

> The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares of Common Stock, or Preferred Stock then outstanding) by the affirmative vote of the holders of a majority of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon, without a vote of the holders of the Preferred Stock, or of any series thereof, or Common Stock unless a vote of any such holders is required pursuant to the terms of any certificate of designation filed with respect to any series of Preferred stock (a "***Certificate of Designation***").

Compare that language with the Class Vote Opt-Out, which states:

> The number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares

37

thereof then outstanding) by the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote irrespective of this subsection . . . .

8 *Del. C.* § 242(b)(2). The only meaningful divergence is that the Single Vote Provision refers to "the affirmative vote of the holders of a majority of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon" rather than "the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote." That distinction makes no difference. Both mean the same thing.

Because the language is functionally identical, the defendants can reasonably read the Single Vote Provision as simply a restatement of the Class Vote Opt-Out. Under Section 242(d)(2)(C), that type of provision does not establish a different voting standard; it simply avoids the need for a separate class vote using the Majority-of-the-Votes-Cast Requirement.

The plaintiff has a strong response. Consistent with the plaintiff's plain language argument, the plaintiff stresses that the Single Vote Provision both (i) identifies an issue and (ii) identifies a voting standard. The plaintiff notes that (i) a certificate of incorporation could satisfy the Class Vote Opt-Out without identifying a voting standard, and (ii) a certificate of incorporation could change aspects of the Class Vote Opt-Out, such as by mandating a higher voting standard or only applying the Class Vote Opt-Out to decreases in the authorized shares. The plaintiff argues convincingly that provisions of that sort would expressly require a different vote and therefore opt out of Section 242(d). The plaintiff also cites different views among

38

issuers and counsel as to the effect of a single vote provision for purpose of Section 242(d)(2). PRB at 10 n. 33; PRB Ex. C.

### a. A Class Vote Opt-Out Need Not Identify A Voting Standard.

The plaintiff first contends that the defendants' interpretation of the Single Vote Provision cannot be right because a Class Vote Opt-Out need not specify a voting standard. They conclude that because the Single Vote Provision goes further and specifies a voting standard, that language must be given effect.

As the plaintiff notes, corporate drafters have devised provisions that implement the Class Vote Opt-Out without specifying a voting standard.[9] For example:

> Except as expressly provided herein, no series of Common Stock shall be entitled to vote as a separate series on any matter except to the extent required by provisions of Delaware law. Irrespective of the provisions of Section 242(b)(2) of the DGCL, the holders of shares of Common Stock will vote as one class with respect to any proposed amendment to this Certificate of Incorporation that (i) would increase (x) the number of authorized shares of common stock or any class or series therefore, (y) the number of authorized shares of preferred stock or any series therefore, or (z) the number of authorized shares of any other class or series of capital stock of the Corporation hereafter established … and no separate class or series vote of the holders of shares of any class or series

---

[9] *See, e.g.*, Amended and Restated Certificate of Incorporation of Smith Douglas Homes Corp. § 4.4; Certificate of Incorporation of GE Vernova Inc. § 4.1; Sixth Amended and Restated Certificate of Incorporation of Dell Technologies Inc. § 5.2(e); Restated Certificate of Incorporation of Liberty Broadband Corporation art. IV, § B.1; Amended and Restated Certificate of Incorporation of PACS Group, Inc., art. V, § A.2; Amended and Restated Certificate of Incorporation of WEBTOON Entertainment Inc. § 4.1.

of capita ls stock of the Corporation will be required for the approval of such matter.

Sixth Amended and Restated Certificate of Incorporation of Dell Technologies, Inc. § 5.2(e).

The plaintiff reasons that because it is possible to satisfy the Class Vote Opt-Out by simply stating that no class of shares votes as a separate class on any amendment to increase a corporation's authorized shares, then the decision to include a voting standard in the Single Vote Provision must have significance. According to the plaintiff, that significance means that language specifying the Majority-of-the-Outstanding Standard must be given effect. That is a strong argument against the defendants' reading of Section 242(d)(2).

### b. The Ability To Specify A Higher Voting Standard

The plaintiff next argues that a provision having the same structure as the Single Vote Provision could be used to establish a higher voting standard for an amendment to increase the authorized shares, either by requiring a supermajority in the numerator or by departing from the votes-cast standard in the denominator. The plaintiff makes a strong case that such a provision would validly opt out of Section 242(d)(2) by "otherwise expressly requir[ing]" a different vote.

Start by returning to the structure of the Single Vote Provision. It does four things:

- Identifies an issue: "The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares of Common Stock, or Preferred Stock then outstanding) . . . ."

40

- Specifies a numerator: ". . . by the affirmative vote of the holders of a majority . . . ."

- Specifies a denominator: ". . . of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon . . . ."

- Rules out other possible voting requirements: ". . . without a vote of the holders of the Preferred Stock, or of any series thereof, or Common Stock unless a vote of any such holders is required pursuant to the terms of any certificate of designation . . . ."

Each of these items can be tweaked to make the provision less like the Class Vote Opt-Out.

First, envision a provision that only applies to decreases in the authorized shares. It might say:

> The number of authorized shares of Common Stock or Preferred Stock may be decreased (but not below the number of shares of Common Stock, or Preferred Stock then outstanding) by the affirmative vote of the holders of a majority of the voting power present at a meeting where a quorum exists, without a vote of the holders of the Preferred Stock, or of any series thereof, or Common Stock unless the certificate expressly requires it.

Before the adoption of Section 242(d)(2), such a provision could be read to conflict with the Class Vote Opt-Out, which addresses both increases and decreases in the authorized shares, and therefore could have been deemed invalid. But once Section 242(d)(2) renders Section 242(b)(2) inapplicable, it becomes harder to argue that this type of provision is not permissible. At that point, the decision only to authorize a single vote for decreases in the authorized number looks like a bespoke provision intended to require something different than Section 242(d)(2). Given the priority Delaware places on enforcing the plain language of charter provisions, it would be harder for a company to argue that Section 242(d)(2)(C) overrode that provision.

41

Next, envision a single vote provision that specifies a supermajority voting requirement. For example, a provision might state:

> The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares of Common Stock, or Preferred Stock then outstanding) by the affirmative vote of the holders of a two-thirds (66 2/3%) of the voting power of all of the outstanding shares of stock of the Company entitled to vote thereon, without a vote of the holders of the Preferred Stock, or of any series thereof, or Common Stock unless the certificate expressly requires it.

Such a provision would "otherwise expressly require[]" a different vote than either Section 242(b)(2) or Section 242(d)(2)(C). Again, it would be hard for a company to argue that Section 242(d)(2)(C) overrode that provision.

Now envision a single vote provision that specifies a different denominator for the unitary vote. Such a provision might state:

> The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares of Common Stock, or Preferred Stock then outstanding) by the affirmative vote of the holders of a majority of the voting power present at a meeting where a quorum exists, without a vote of the holders of the Preferred Stock, or of any series thereof, or Common Stock unless the certificate expressly requires it.

Before the adoption of Section 242(d)(2), such a provision would conflict with the voting standard in Section 242(b)(2) and be invalid. But once Section 242(d)(2) renders Section 242(b)(2) inapplicable to qualifying votes to increase or decrease the authorized shares, a corporation might agree to replace the Majority-of-Votes-Cast Standard with a different standard, such as a Majority-of-the-Quorum Standard. Here too it would be much harder for a company to argue that Section 242(d)(2)(C) overrode that provision.

Last, envision that a provision specifies that some classes or series vote together while others to vote separately. Such a provision might state:

> The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares of Common Stock, or Preferred Stock then outstanding) by the affirmative vote of the holders of a majority of the shares of the Common Stock, the Series A Preferred Stock, and the Series B Preferred Stock voting together as a single class, but with the Series C Stock voting separately.

Such a provision would seem even more like a bespoke arrangement that Section 242(d)(2) would not override.

One can also envision a provision that makes more than one of these changes, such as by requiring a supermajority for the numerator and a Majority-of-the-Quorum Standard for the denominator. Such a provision might state:

> The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares of Common Stock, or Preferred Stock then outstanding) by the affirmative vote of the holders of two-thirds (66 2/3%) of the voting power present at a meeting where a quorum exists, without a vote of the holders of the Preferred Stock, or of any series thereof, or Common Stock unless the certificate expressly requires it.

That sure looks like a provision that would "otherwise expressly require[]" a different vote than Section 242(d) contemplates.

These are not hypothetical questions. The plaintiff has identified Delaware corporations whose charters contain single vote provisions that require a

43

supermajority vote to increase or decrease the authorized shares of a class or series

of stock.[10] For example:

> Subject to the rights of the holders of any series of Preferred Stock, the number of authorized shares of any of the Class A Common Stock, the Class B Common Stock or the Preferred Stock may be increased or decreased (but not below the number of shares of the Class A Common Stock, the Class B Common Stock or the Preferred Stock, as the case may be, then outstanding) by the affirmative vote of the holders of shares of capital stock of the Corporation representing at least 66 2/3% of the voting power of all the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, on such increase or decrease irrespective of the provisions of Section 242(b)(2) of the Delaware General Corporation Law, and no vote of the holders of any of the Class A Common Stock, the Class B Common Stock or the Preferred Stock voting separately as a class shall be required therefor.

Amended and Restated Certificate of Incorporation of Kura Sushi USA, Inc. § 4.1.

During oral argument, the defendants correctly noted that this case does not

involve any of these variations, but that is not an answer. Testing propositions using

hypotheticals and analogies is a core part of legal reasoning.[11] The fact that a party's

---

[10] *See, e.g.*, Amended and Restated Certificate of Incorporation of Kura Sushi USA, Inc., § 4.1; Certificate of Incorporation of 23andMe Holding Co. § 4.5; Second Amended and Restated Certificate of Incorporation of LF Capital Acquisition Corp. § 4.4.

[11] *See, e.g.*, Ruggero J. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 91 (3d ed. 1997) ("Inductive generalization underlies the development of the common law. From many specific case holdings, we reach a generalized proposition."); Edward H. Levi, *An Introduction to Legal Reasoning* 1 (1948) ("The basic pattern of legal reasoning is reasoning by example. It is reasoning from case to case." (footnote omitted)); Diana J. Simon, *Focused and Fun: A How-to Guide for Creating Hypotheticals for Law Students*, 19 Scribes J. Legal Writing 161 (2020) (discussing the use of hypotheticals for teaching law); Dan Hunter, *Reason Is Too Large: Analogy and Precedent in Law*, 50 Emory L.J. 1197, 1202 (2001) ("Analogy and precedent play

argument cannot accommodate a hypothetical involving a slight change to the facts suggests that the party has advanced a position of convenience rather than a position based on principle. *Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 401 (Del. Ch. 2008) ("The oddities of the Sun-Times System become clear when one applies it to some examples of what might take place in a real-world proceeding.").

The plaintiff argues that if a Delaware court would enforce a single vote provision that departed from the Class Vote Opt-Out in one or more of these ways, then it is the structure of the single vote provision, not its content, that matters. The plaintiff concludes that simply because the Single Vote Provision in this case tracks the Class-Vote Opt-Out does not mean a court should not give effect to its language. That is another strong argument against the defendants' reading of Section 242(d)(2).

---

a central role in legal reasoning. When Chief Justice Rehnquist invokes *Patterson* and *Bouie*, when a law professor suggests a difficult hypothetical in class and a student tentatively guesses at the answer based on the cases that she read the night before, or when an attorney advises a client to settle because a previous case goes against him, all are drawing analogies between the current case and one or more precedents. Noting similarities between cases and adapting them to fit new situations are two of the defining characteristics of legal reasoning within common law systems."); Cass R. Sunstein, *On Analogical Reasoning Commentary*, 106 Harv. L. Rev. 741, 741 (1993) ("Reasoning by analogy is the most familiar form of legal reasoning. It dominates the first year of law school; it is a characteristic part of brief-writing and opinion-writing as well."); E. Barrett Prettyman Jr., *The Supreme Court's Use of Hypothetical Questions at Oral Argument*, 33 Cath. U. L. Rev. 555 (1984) (discussing the importance of responding to hypothetical questions; noting that: "no serious advocate can consider himself or herself even remotely prepared unless this aspect of the argument has been faced and dealt with.").

### c. A Lack Of Uniform Interpretation

Last, the plaintiff argues against the defendants' interpretation by pointing to market practice, something all the rage of late. The plaintiff has collected both law firm client memos and public disclosure documents which take positions contrary to the defendants' view of the plain meaning of Section 242(d)(2). The plaintiff argues that the disagreement indicates that the defendants' position cannot be the only reasonable interpretation.

As one source of market practice, the plaintiff cites law firm memos describing the effect of Section 242(d)(2). Some of those memos adopt the defendants' interpretation,[12] but others suggest that a provision like the Single Vote Provision would be sufficient to opt out of Section 242(d)(2).[13]

As another source of market practice, the plaintiff cites public disclosures in which companies have described the voting standard that would apply to an amendment to increase or decrease the authorized number of shares. Companies that

---

[12] *E.g.,* Bayard Law, *Delaware General Corporation Updates Enacted Into Law* (July 26, 2023), ("[A] general recitation of the voting standard set forth in Section 242(b) without specific reference to Section 242(d) will not be sufficient to 'opt out' of Section 242(d).").

[13] *E.g.,* Baker Hostetler LLP, *Delaware Implements Amendments to the Delaware General Corporation Law, Effective as of Aug. 1, 2023* (Aug. 21, 2023) ("Accordingly, if a corporation's existing charter expressly requires the preexisting stockholder approval thresholds, those historic thresholds will continue to govern. If a corporation's board of directors determines that the amendments . . . are not desirable, such boards should consider amending their charter to either specifically opt out of [Section] 242(d) or expressly provide that the stockholder approval thresholds otherwise required by [Section] 242(b) will govern.").

46

have charter provisions like the Single Vote Provision have described the required vote for such an amendment as if their single vote provisions opted out of Section 242(d)(2).[14]

Despite the current insistence in some quarters on the primacy of market practice, "market practice is not law." *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 878 (Del. Ch. 2024). When market practice is both well-established and clear, a judge may take it into account as a reflection of what experienced counsel believe is legally permissible. But when market practice falls short of that standard, the noise drowns out any signal. *Compare In re Fox*

---

[14] *See, e.g.*, Adicet Bio, Inc., Proxy Statement for Annual Meeting of Stockholders 22 (Apr. 23, 2024) (interpreting Third Amended and Restated Certificate of Incorporation of Adicet Bio Inc. art. IV); Aemetis Inc., Proxy Statement for Annual Meeting of Stockholders 15–17 (Apr. 29, 2024) (interpreting Certificate of Incorporation of Aemetis, Inc. art. IV, § 1); Nkarta Inc., Proxy Statement for Annual Meeting of Stockholders 49 (Apr. 25, 2024) (interpreting Restated Certificate of Incorporation of Nkarta, Inc. FOURTH, A.4); Life360 Inc., Proxy Statement for Annual Meeting of Stockholders 9 (Apr. 16, 2024) (interpreting Amended and Restated Certificate of Incorporation art. IV, § (B)4); Liquidia Corp., Proxy Statement for Annual Meeting of Stockholders 5 (Apr. 29, 2024) (interpreting Certificate of Incorporation of Liquidia Corporation art. IV, § C.1(b)); Ocular Therapeutix Inc., Proxy Statement for the Annual Meeting of Stockholders 3 (Apr. 29, 2024) (interpreting Restated Certificate of Incorporation of Ocular Therapeutix, Inc. FOURTH, § A.2); Rocket Pharmaceuticals Inc., Proxy Statement for the 2024 Annual Meeting of Stockholders 4 (Apr. 29, 2024) (interpreting Seventh Amended and Restated Certificate of Incorporation of Inotek Pharmaceuticals Corporation art. IV); Scholar Rock Holding Corp., Proxy Statement for the 2024 Annual Meeting of Stockholders 5 (Apr. 29, 2024) (interpreting Amended and Restated Certificate of Incorporation of Scholar Rock Holding Corporation art. IV); Fibrobiologics Inc., Proxy Statement for the 2024 Annual Meeting of Stockholders 3 (July 8, 2024) (interpreting Amended and Restated Certificate of Incorporation of Fibrobiologics, Inc. § 2.FOURTH).

*Corp./Snap Inc.*, 312 A.3d 636, 650 (Del. 2024) (approving trial court's consideration of forty years of consistent market practice regarding absence of need for class vote under Section 242(b) for approval of exculpatory provision) *with Moelis*, 311 A.3d at 878–79 (declining to give weight to inconsistent market practice regarding ability of governance agreement to override Section 141(a)). Here, the market practice is not sufficiently consistent to support a particular interpretation. Instead, it suggests that practitioners have reached a variety of conclusions, reinforcing the existence of ambiguity.

### 3.    Resolving The Ambiguity

"[A] provision may be ambiguous when applied to one set of facts but not another." *Activision Blizzard, Inc. v. Hayes*, 106 A.3d 1029, 1034 (Del. 2013); *accord E.E.O.C. v. Curtiss-Wright Corp.*, 1982 WL 602, at *2 (D.N.J. Apr. 12, 1982) ("Statutory language is sometimes unambiguous in one context and ambiguous in another."); *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 619 (Md. 1995) ("A term which is clear in one context may be ambiguous in another."). As applied to the Single Vote Provision, Section 242(d) is ambiguous. Resolving the ambiguity requires looking to sources beyond the statutory text. A court may also apply interpretive canons.

### a.    The Synopsis

When a statute is ambiguous, courts frequently look to legislative history. *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 84 (Del. 1998) (noting that when interpreting an ambiguity, "it is proper to search for guidance in legislative history"). In Delaware, the available legislative history is sparse and consists largely of the

legislative synopsis. "A synopsis is a proper source for ascertaining legislative intent."

*Bd. of Adjustment of Sussex Cnty. v. Verleysen*, 36 A.3d 326, 332 (Del. 2012)

The Council is principally (if not exclusively) responsible for drafting synopses for entity-related legislation. Here, the synopsis suggests that a provision like the Single Vote Provision should not be sufficient to "otherwise expressly require[]" a different vote than Section 242(d)(2). The pertinent passage states:

> Notably, the "unless otherwise expressly required by the certificate of incorporation" lead-in to subsection (d) permits a corporation to "opt in" to the stockholder votes that otherwise would be required under subsection (b). . . . Any such provision in the certificate of incorporation must expressly state that the stockholder vote otherwise required under subsection (b) is required to adopt any amendment to the certificate of incorporation specified in subsection (d) or must expressly "opt out" of the provisions of subsection (d). A general recitation in the certificate of incorporation of the vote generally required under subsection (b) without a specific reference to the amendments specified in subsection (d) is not sufficient.

Del. S.B. 114 syn., 152d Gen. Assem. (2023).

The most probative language in this passage asserts that "[a] general recitation in the certificate of incorporation of the vote generally required under subsection (b) without a specific reference to the amendments specified in subsection (d) is not sufficient." But that language is not directly on point because it refers to "the vote generally required under subsection (b)." There are two votes "generally required under subsection (b)": the Majority-of-the-Outstanding Requirement mandated by Section 242(b)(1) and the Majority-of-the-Class Requirement mandated Section 242(b)(2). The Class Vote Opt-Out is neither required (it is optional) nor a vote (it dispenses with an otherwise required vote).

49

But while not directly on point, the "general recitation" concept suggests that the Council thought that a provision tracking an aspect of the language in Section 242(b) would not go far enough to meet the "otherwise expressly required" test. The Single Vote Provision closely tracks the Class Vote Opt-Out and thus resembles something like a "general recitation."

The Synopsis thus supports interpreting the ambiguous language of Section 242(d) in the defendants' favor.

### b. The Public Policy Of Making Increases Easier

When a statute is ambiguous, a court can consider the statute's apparent purpose, including relevant considerations of public policy. *Wyatt v. Rescare Home Care*, 81 A.3d 1253, 1261 (Del. 2013). Law firms whose partners serve on the Council issued memoranda discussing the 2023 Amendments. Those memoranda provide insight into the Council's purpose and the public policy considerations its members found persuasive.

The practitioner memoranda describing the 2023 Amendments make clear that the Council sought to make it easier for corporations to increase their authorized shares. The memoranda discuss how public corporations with large numbers of retail investors had encountered difficulties securing approval for increases under the Majority-of-the-Outstanding Standard. The memoranda explained that due to rational apathy, retail investors are less likely to return proxy cards and vote. The memoranda also noted that some brokers instituted policies requiring them to decline to exercise their discretionary authority to vote shares held in street name, resulting

50

in additional shares not voted. The memoranda regard facilitating a corporation's ability to increase its authorized shares as a public policy goal because of the many possible uses of the additional shares.[15]

Interpreting the Single Vote Provision to "otherwise expressly require[]" a vote under the Majority-of-the-Outstanding Standard would make it harder, rather easier, to obtain the vote necessary to increase a corporation's authorized shares. That outcome runs contrary to the Council's goal of making that easier.

When drafting Section 242(d), the Council referenced the Class Vote Opt-Out in Section 242(d)(2)(C). And because corporate practitioners usually like to have a precedent or form to follow, it was and remains likely that many corporations implemented the Class Vote Opt-Out through provisions that tracked its language, including its reference to a majority of the shares entitled to vote. That fact would not have been lost on the Council. Given the potentially many charter provisions in the wild that tracked the Class Vote Opt-Out, interpreting a provision like the Single Vote Provision to "otherwise expressly require[]" a vote under a Majority-of-the-Outstanding Standard would handicap the ability of Section 242(d) to make

---

[15] *See generally, e.g.*, Pamela L. Millard & Alexander Dirienzo, *2023 Amendments to the Delaware General Corporation Law: A Summary* (Sept. 15, 2023); Skadden, Arps, Slate, Meagher & Flom LLP, *Proposed Changes to Delaware Law Would Facilitate Ratification of Defective Corporate Acts, Disposition of Pledged Assets, Stock Splits and Changes to the Number of Authorized Shares*, (May 25, 2023); Richards, Layton & Finger, P.A., *2023 Proposed Amendments to the General Corporation Law of the State of Delaware* (May 1, 2023).

increasing the number of authorized shares easier. It seems unlikely that the Council would have intended that result.

The purpose of Section 242(d) and the public policy goal of making it easier for corporations to increase their authorized shares thus support interpreting its ambiguous language in the defendants' favor.

### c. Timing

When resolving ambiguity, a court may also consider how a statute evolved. *See VonFeldt*, 714 A.2d at 84 (tracing development of ambiguous statute). Here, the ambiguity turns on the interaction between Section 242(d) and a Class Vote Opt-Out like the Single Vote Provision. A key event is therefore the introduction of Section 242(d) relative to the adoption of the Single Vote Provision.

Under the Section 242(b)-only regime, corporations adopted provisions like the Single Vote Provision to make it easier to increase or decrease their authorized shares. The Company adopted the Single Vote Provision in 2018, predating Section 242(d) by five years. The Council seems to have intended for Section 242(d) to reset the voting regime for amendments relating to authorized shares. It follows that the Council likely intended for Section 242(d) to override pre-existing provisions that sought to implement the Class Vote Opt-Out.

By contrast, if a corporation adopted a provision like the Single Vote Provision *after* the enactment of Section 242(d), that would suggest an effort to depart from the new default rule that Section 242(d) imposed. There is no indication that Section 242(d) sought to override future provisions. To the contrary, Section 242(d) expressly

calls for a different voting standard if "otherwise expressly required" by a corporation's charter.

Here, the Single Vote Provision predated the 2023 Amendments. That sequence supports the defendants' interpretation.

### d. The Presumption Favoring Voting Rights

So far, the extrinsic evidence has favored the defendants. But one other means of addressing ambiguity could favor the plaintiff. That is the interpretive canon that a court should interpret an ambiguous provision in favor of voting rights. *See Centaur P'rs*, 582 A.2d at 924–27; *Harrah's Ent.*, 802 A.2d at 311–12.

But there is a problem with applying that canon here: What outcome favors voting rights? There are two possible groups of stockholders: those who want to increase the authorized shares, and those who either don't want to or don't vote. Interpreting the Single Vote Provision as the defendants propose would favor the voting rights of the stockholders who want to increase the authorized shares. Interpreting the Single Vote Provision as the plaintiff proposes would favor the voting rights of the stockholders who don't. The former approach promotes affirmative voting and change. The latter approach favors blocking rights and the *status quo*.

Doubtless there are cases where the record provides a basis for choosing between two sets of stockholders. In this case, the interpretive canon could favor either outcome. This decision therefore does not rely on it.

### 4. The Outcome In This Case

The extrinsic evidence either points in favor of the defendants' interpretation or is inconclusive. The Single Vote Provision therefore does not trigger a Majority-of-the-Outstanding Requirement. The correct voting standard for the Proposed Amendment is the Majority-of-the-Votes-Cast Standard.[16]

## III. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. It follows that the plaintiff's motion for a preliminary injunction is denied. The court will enter the proposed order that the defendants submitted with their motion. The court intends for that order to be its last act in the case, bringing this dispute to a close at the trial level.

---

[16] This outcome does not foreshadow a similar result for all other single vote provisions. The Single Vote Provision in this case closely tracked the Class Vote Opt-Out and predated the 2023 Amendments. Together, those factors defeated the argument for reading the Single Vote Provision as language that "otherwise expressly required" a vote under the Majority-of-the-Outstanding Standard. The same reasoning might not apply to a provision that did not so closely track the Class Vote Opt-Out or that post-dated the 2023 Amendments.